# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DICKSON INDUSTRIES, INC.**, (1) ) | | |
| an Oklahoma corporation, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | **CASE NO. CIV-02-467-HE** |
| ) | | |
| **PATENT ENFORCEMENT TEAM, L.L.C.**, (2) ) | | |
| a Florida limited liability company, ) | | |
| ) | | |
| Defendant, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| **MIDSTATE TRAFFIC CONTROLS, INC.**, (3) ) | | |
| an Oklahoma corporation, ) | | |
| ) | | |
| and ) | | |
| ) | | |
| **SAWHORSE INVESTMENTS, L.L.C.**, (4) ) | | |
| an Oklahoma limited liability company, ) | | |
| ) | | |
| Third-party defendants. ) | | |

### DEFENDANT PATENT ENFORCEMENT TEAM, LLC'S REPLY TO PLAINTIFF DICKSON INDUSTRIES, INC.'S PROPOSED CLAIM CONSTRUCTION AND MARKMAN BRIEF

**Joseph W. Bain**
**Mark Zylka**
**AKERMAN SENTERFITT**
222 Lakeview Avenue, 4th Floor
West Palm Beach, FL 33401-6183
Telephone: (561) 653-5000
Facsimile: (561) 659-6313

**Micheal Salem**   OBA #7876
*Salem Law Offices*
111 North Peters, Suite 100
Norman, Oklahoma  73069-7235
(405) 366-1234
(405) 366-8329  TELEFAX
Attorneys for Defendant PET

{WP316157;1}

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND NO NEED FOR EXPERT TESTIMONY .............................. 1

II.    CLAIM CONSTRUCTION ………….……………………………............................ 2

     A.    Road Includes Its Paved Shoulders ………............................................................ 2

     B.    Moving the Rotating Cutting Cylinder Along the Road, and Simultaneously, Moving Said Cylinder Alternately Up Above the Road Surface and Down Into Said Road Surface, to Thereby Form a Plurality of Grooves ………….............................. 7

     C.    Generally Parallel Grooves ……………………………………………... 11

V.    CONCLUSION ……………………………………………………………............ 13

# TABLE OF AUTHORITIES

**CASES** **Page**

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318 (Fed. Cir. 2003) …….. 5

*Bell & Howell Document Management v. Altek Sys.*, 132 F.3d 701 (Fed. Cir. 1997) ……..... 5

*Engel Industries, Inc. v. Lockformer Co.*, 96 F.3d 1398 (Fed. Cir. 1996) …………………. 5

*E-Pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 n.5 (Fed. Cir. 2003) ……… 5

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ……………………… 4, 5

*Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1342 (Fed. Cir. 2003) …………………. 4

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 1995) ………………………………….. 2, 3

*Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372 (Fed. Cir. 2000) ………………………… 4

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) …………………4, 5

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DICKSON INDUSTRIES, INC.**, (1) an Oklahoma corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **CASE NO. CIV-02-467-HE** |
| **PATENT ENFORCEMENT TEAM, L.L.C.**, (2) a Florida limited liability company, | ) ) ) ) | |
| Defendant, | ) ) | |
| vs. | ) ) | |
| **MIDSTATE TRAFFIC CONTROLS, INC.**, (3) an Oklahoma corporation, | ) ) ) | |
| and | ) ) | |
| **SAWHORSE INVESTMENTS, L.L.C.**, (4) an Oklahoma limited liability company, | ) ) ) | |
| Third-party defendants. | ) | |

**DEFENDANT PATENT ENFORCEMENT TEAM, LLC'S REPLY
TO PLAINTIFF DICKSON INDUSTRIES, INC.'S PROPOSED
<u>CLAIM CONSTRUCTION AND MARKMAN BRIEF</u>**

**I.   INTRODUCTION AND NO NEED FOR EXPERT TESTIMONY**

Dickson's claim construction brief confirms that the parties agree in large part. The points of dispute are focused on whether the groove cutting method of claim 5 includes such cutting on a paved shoulder of a road; whether claim 5 covers grooves cut end to end down the road; and whether claim 5 requires the cutting cylinder to cycle up and down to cut two or more grooves without stopping or interruption. Because Dickson's proposed constructions are not

{WP316157;1}

supported by the intrinsic evidence, Dickson seeks to rely on extrinsic evidence, particularly the testimony of the inventor for his subjective intent 20 years after the fact, contrary to the legion authority that such testimony is of little or no value as to the legal question of patent claim construction.

Based on the issues presented in the Markman briefs and the ability to resolve these issues with the intrinsic evidence of record, and perhaps confirmatory reference to dictionaries, PET submits that the issues can be decided on the papers, and with oral argument.  PET submits that there should be no need to incur the expense of providing expert or other testimony at the *Markman* hearing.  Such expert involvement would only serve to unnecessarily complicate the issues and introduce the litigation driven bias that the court warned against in *Phillips v. AWH Corp.,* 415 F.3d 1303, 1318-19 (Fed. Cir. 1995).

## II.   CLAIM CONSTRUCTION

### A.   Road Includes Its Paved Shoulders

Dickson construes the term "road" in claim 5 of the '069 patent so as to exclude the paved shoulder of the road.  Dickson improperly overemphasizes the extrinsic evidence to support its contentions.  The various flaws of Dickson's position will be addressed in turn below.

As for the intrinsic record, Dickson selectively picks and chooses certain language in the specification and misleadingly uses the drawings of the '069 patent to support its definition.  In the case of the drawings, Dickson points to reference number 72 as being the road and reference number 74 being the shoulder.  However, Dickson's labeling in its brief at p. 6 is not correct and not supported by the actual specification.  Reference number 72 is actually the road surface whereas reference number 70 is the road.  Dickson is simply incorrect when it points to surface 72 as being the road to the exclusion of the shoulder.  In FIG. 2, the road 70 is directed to the

entire paved area with an arrow.  This paved area includes the surface 72 and the shoulder 74.  Lest there be any doubt that the shoulder 74 is part of the road 70, FIG. 3 shows that road 70 pointing to the paved material, with the shoulder surface 74 directly above.  The specification consistently describes the shoulder as part of the road, as noted in PET's principal brief at 14-15.

PET has always maintained that the road surface (72) and the shoulder (74) are sub-features of the broader recitation of a "road" (70).  PET's claim construction is fully supported by the written description of the '069 patent.  Interestingly, the very portions of the specification that Dickson relies on in its Markman brief as being supportive of its position actually show that Dickson's reliance is misplaced.

The remainder of Dickson's arguments are based on two sources of extrinsic evidence – a 1988 manual and the deposition testimony of Mr. James Whitney, the '069 patent inventor.  Dickson's heavy reliance on extrinsic evidence belies the lack of support in the intrinsic record for its interpretation.  The Federal Circuit has explained that such extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317.  In this case, Dickson is using the extrinsic record to distract the Court's attention from the plain and clear language of claim 5 of the '069 patent as well as the rest of the intrinsic record.  Nonetheless, PET will explain why the Court should disregard the extrinsic evidence presented by Dickson.

Dickson's citation to the Manual on Uniform Traffic Control Devices ("Manual") to provide a definition of "roadway" that specifically excludes the berm or shoulder.  The fact that the definition refers to a "berm" would strongly suggest that it is referring to a non-paved area, such as a gravel or grassy portion adjacent to the road.  PET wants to make absolutely clear that it does not contend that the term "road" includes unpaved shoulders, such as grass or gravel areas

next to the pavement. Rather, PET contends that the term road embraces not only the regular vehicular travel lanes but also those paved emergency lanes and shoulders that are adjacent to the travel lanes.

Further, Dickson's extrinsic evidence is directly at odds with the equally persuasive extrinsic evidence cited by PET; specifically, a publication of the Federal Highway Administration that defines a "roadway" as including a shoulder. It is quite clear that the Manual does not provide any better guidance as to the meaning of the term "road" than the intrinsic record itself. Therefore, Dickson's Manual citation should be disregarded.

As for the deposition testimony of Mr. Whitney, Dickson attempts to alter the plain meaning established by the intrinsic evidence by improper reliance on inventor testimony, obtained nearly twenty years after the application was written and filed. Dickson appears to rely on the inventor statements on two grounds: subjective intent of the inventor and the inventor's alleged knowledge of how one skilled in the art would understand the term. Dickson Markman Brief at 9 and fn. 2. Each ground will be addressed in turn below.

As to the inventor's subjective intent, this case is a classic example of why inventor testimony should not be relied on. Federal Circuit case law is replete with cautions against relying on inventor testimony. *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379-80 (Fed. Cir. 2000) ("what the patentee subjectively intended his claims to mean is largely irrelevant to the claim's objective meaning and scope ... ."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ("Nor may the inventor's subjective intent as to claim scope, when unexpressed in the patent documents, have any effect. Such testimony cannot guide the court to a proper interpretation when the patent documents themselves do so clearly."). In *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1342 (Fed. Cir. 2003), the Federal Circuit considered inventor

deposition testimony to be of "little value in the definiteness analysis or claim construction." *See also Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318 (Fed. Cir. 2003) (an inventor's testimony "is of little consequence in the claim construction analysis. That analysis must be based primarily on the record established at the time the patent was granted."). The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. *Vitronics*, 90 F.3d at 1583.

In *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995)(en banc), the Federal Circuit stated that "the subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim(except as documented in the prosecution history)." *See also, E-Pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 n.5 (Fed. Cir. 2003); *Engel Industries, Inc. v. Lockformer Co.*, 96 F.3d 1398 (Fed. Cir. 1996). The Federal Circuit has also noted that "the testimony of an inventor is often a self-serving, after-the-fact attempt to state what should have been part of his or her patent application …" *Bell & Howell Document Management v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997). PET submits that a corollary applies in this case where a disgruntled inventor, who has sold his rights and later learns of the purchaser's success, attempts to limit the scope of the claims.

Aside from the great body of law viewing inventor testimony with great skepticism and according it "little or no weight," Mr. Whitney's testimony is suspect on its face on a number of grounds. First, it is clear that Mr. Whitney is a disgruntled inventor who has an axe to grind. His bias is revealed in his deposition testimony. See, for example, Dickson Exhibit 3, at p. 167, line 2 – p. 168, line 12. Mr. Whitney learned of the royalties that PET is earning on claim 5 and

admits that these are the royalties he would like to have earned and had he known, he would have charged more when he sold the patent.

In a clear attempt to have the claim destroyed by PET's own alleged acts, Mr. Whitney concocts a story of seeing rumble strips on a shoulder before his application (over 20 years ago!) that he attributes to PET and speculates were cut by the method of claim 5.  Dickson Exhibit 3, at p. 80-81.  Later, Mr. Whitney's desire to pin invalidity on prior acts of Mr. Thomas and PET is belied by his volunteering testimony at Dickson Exhibit 3, page 115, lines 4-19.

The biggest problem with Mr. Whitney's sabotage is that neither PET, its principal Mr. Thomas nor anyone associated with them cut rumble strips until the early 1990's--years **after** the '069 patent issued.  If desired by the court, PET can submit declarations on this point, but PET submits that this issue is irrelevant for purposes of legal claim construction under *Markman*. Whether it is relevant to issues at trial is another matter for another day.  The credibility issues demonstrate why such inventor testimony (which the public has no access to when reading the '069 patent and it file history) is to be accorded "little or no weight."

Based on its footnote, Dickson seems to also contend that Mr. Whitney has knowledge that one skilled in the art would consider the shoulder to be excluded from the road based on his 40 years of experience.  Dickson Brief at 9, fn. 2.  Yet, Dickson fails to note that Whitney, despite this 40 years of experience in **paint striping**, clearly testified that he does not know what one skilled in the art of road construction would think and that he believes some in the art would in fact consider the shoulder part of the road.  Dickson Exhibit 3, at p. 128, line 13 – p. 132, line 10.

Finally, Mr. Whitney himself acknowledges that the method recited in claim 5 would not have to be performed in any different way if one wanted to cut rumble strips in the shoulder as

opposed to cutting them in the edge of the travel lane.  Dickson Exhibit 3, at p. 195, line 21 – p. 196, line 11.

Dickson also makes a parting shot at the fact that PET obtained allowance of a new claim 14 in the reexamination.  Dickson Brief, p. 11.  The patent system provides for the presentation of multiple claims.  35 U.S.C. §112, ¶ 2 ("The specification shall conclude with one or more claims.")  That a detailed claim 14 was presented and approved states nothing about claim 5, which was equally approved without any amendments.  To be sure, claim 5 is broader (and reaches back before the reexamination for purposes of assessing damages) and thus is subject to greater debate and cost of litigating, as the present Markman proceedings demonstrate.  But, to assert that the co-existence of a more detailed claim suggests that the broader claim is somehow limited is baseless.  It is no surprise that Dickson cites no legal authority for this proposition.

In light of the above, it is submitted that Dickson's litigation-driven construction of the claim term "road" is devoid of support in the intrinsic record, and Dickson's reliance on the extrinsic evidence, and particularly suspect inventor testimony, is contrary to well established law.  Therefore, Dickson's construction of the term "road" to exclude paved shoulders should be rejected.

> B.  Moving the Rotating Cutting Cylinder Along the Road, And Simultaneously, Moving Said Cylinder Alternately Up Above The Road Surface And Down Into Said Road Surface, To Thereby Form A Plurality of …Grooves

Dickson's position on this "moving" phrase confirms PET's observation that there is much agreement between the parties as to the meaning of the disputed claim phrases.  Both Dickson and PET agree that the cutting cylinder must *simultaneously* rotate, move down the road and move up and down.  Yet, Dickson contends that simultaneous action need only occur when a

{WP316157;1}

groove is being cut (and not between cuts), and then ambiguously suggests that "The process is repeated to cut a plurality of grooves."  Dickson Brief, p. 13.

Dickson's proposed construction ignores the claim language that requires "*moving*" the cylinder "*alternately*" up and down to form a "*plurality*" of grooves.  "Moving" requires continuous motion; "alternately" requires a cycle (not just one up and down); and "plurality" requires more than one.  All of this up and down motion is to occur simultaneously with moving down the road and rotating.

Contrary to Dickson's assertions, this claim language does state that the cylinder moves up and down and up and down to cut a plurality of grooves.  To put a finer point on it, claim 5 actually states that the cylinder move alternately **up** above the road surface **first**, **and then down** into said road surface.  If, according to the express language of claim 5, the cutting cylinder is moving alternately up above the road surface, it must be moving out of a first groove cut and then claim 5 requires that it move down into the road surface, which would result in the second groove being cut.

According to Dickson's proposed interpretation, the cutting cylinder would come up above the road surface and remain there for an indeterminate period and distance before the cylinder is then lowered to make a further cut.  Such construction is at odds with the plain and clear meaning of moving alternately up and down…to form a plurality of …grooves.

Dickson attempts to obscure the issue by noting that a preferred methodology set forth in the specification meets PET's claim construction and then contending that somehow PET is trying to limit the claim to the preferred embodiment.  *Id.*  While the parties agree with the legal principle that features of preferred embodiment(s) in the specification are not to be improperly incorporated into a claim, this principle guards against such incorporation when the claim

language itself does not support the feature.  In claim 5, however, the express language does recite the feature that the cylinder is moved alternately up and down to form a plurality of grooves.

Dickson further clouds the otherwise straightforward claim construction issue by referencing Dickson's asserted prior art and the statements of Mr. Whitney that he observed the saw cut slots for reflectors.  *Id.*  These disputed facts are irrelevant to what the claim language means, which is a legal issue.

Further, by Dickson's reasoning applied with respect to shoulder issue (see section A above), Mr. Whitney's observations prior to the application should support that the language of claim 5 distinguishes over this prior art.  Yet, Dickson appears to argue that such observations by the inventor support a broader construction that covers the alleged prior art.  Dickson's argument is a red herring that only serves to distract from the proper claim construction supported by the express language of claim 5.

Instead of this questionable extrinsic evidence, PET would direct the Court's attention to further intrinsic evidence from the publicly available file history of the reexamination.  Dickson Exhibit 5.  The reexamination was instituted by an undisclosed third party by an attorney Eric LaMorte.  Dickson Exhibit 5, part two at p. 57.

The patent examiner instituted the reexamination and initially rejected claim 5 on the basis of several prior art references provided by Mr. Lamorte.  Dickson Exhibit 5, part two at p. 2 and p. 5.

PET responded and argued that the "moving" claim phrase at issue here requires the three simultaneous and continuous motions to cut a plurality of grooves.  See Dickson Exhibit 5, Part

1, response at pp. 63-68 (of 75).  Note that, among the prior art distinguished, PET discussed and distinguished the rumble strips cut as described in a California DOT report:

> The CA report describes no more that a modified plunge cut, differing from the Kennedy plunge cut only in that ***the cutting head moves forward the measured distance only while the cutting is occurring.***

(emphasis added).  This is exactly the construction that Dickson now urges.  PET distinguished the claim phrase at issue without change.

The patent examiner agreed.  In the "Notice of Intent to Issue Ex Parte Reexamination Certificate" which confirmed the patentability of claim 5 (without any amendment) (Id. at 5-6), the examiner stated in his "Statement of Reasons for Patentability and/or Confirmation":

> [T]he prior art does not provide motivation for having used the prior art apparatuses in the manner claimed in the process limitations.  Specifically, although there are prior art apparatuses capable of performing functions of claims 5-7 and 14, ***there is neither teaching nor motivation for moving the rotating cylinder along the road while simultaneously moving the cylinder alternately up above the road surface and down into the road surface.***

Dickson Exhibit 5, Part 1, at p. 6 (emphasis added).

Thus, this file history, which is part of the intrinsic evidence that the court should consider in claim construction, the claim phrase at issue was distinguished from a prior art operation that meets Dickson's proposed construction of the "moving" phrase, and such distinction was expressly adopted by the patent examiner in confirming the patentability of claim 5 over prior art that he originally asserted.

In light of the above, the Court should reject Dickson construction of the "moving" phrase and adopt PET's construction, consistent with the express claim language, the specification and the prosecution history.

    C.    Generally Parallel Grooves

Just as noted in section B above with respect to the "moving" phrase, Dickson's proposed claim construction of the phrase "generally parallel grooves…each groove having a forward side wall and a rearward side wall" ignores express language of claim 5 of the '069 patent. Dickson fails to address the claim's recitation of forward and rearward sidewalls. As noted in PET's *Markman* brief, the recitation of these sidewalls leaves no doubt as to the orientation of the grooves. Such definition in claim 5 itself, and consistent with the usage in the specification, requires that the grooves are oriented transverse, i.e. across the road, so that one side wall is forward and one side wall is rearward. End to end grooves down the road simply do not have forward and rearward side walls relative to the longitudinal, travel direction of the road. Considering the only purposes for the grooves discussed in the entire intrinsic patent file—rain drainage and rumble strip vibration—the grooves must be transverse to perform either function.

The dispute between the parties is whether end to end grooves down the road are embraced by claim language of claim 5. Dickson says it does; PET maintains it does not.

Dickson attempts to distract from this simple debate by nit-picking on whether the grooves are truly perpendicular to the travel direction of the road and whether the side walls are exactly parallel to each other. First, as to perpendicularity, "transverse" is not so exacting. Perhaps, due to the alignment of the machine relative to the road, the cuts are at, for example, 85 degrees, rather than a true 90 degrees. Grooves at an 85 degree angle would still be across the road and have a forward side wall and a rearward side wall. Such precision is not the point. The point is that, at the other extreme, Dickson's proposed end-to-end grooves extending down the road (which would have an angle of around 0 degrees) are, by no stretch of the imagination, across the road with forward and rearward side walls.

{WP316157;1}

Next, with respect to whether the side walls are parallel to each other, there is agreement that the claim only requires that the grooves are parallel. Yet, once again, this is a semantic point. If the length dimensions of grooves are parallel to each other, then the sides corresponding to the length dimension are likewise parallel. PET's reference to the side walls was made only to describe the parallel nature of the length dimension of the grooves and contrast such parallel length dimension with the width dimension of the end-to-end slots asserted by Dickson. PET did not intend to interject another issue and clarifies that what is proposed for claim 5 is that the length dimensions of the grooves must be parallel to each other.

Dickson points out that, in the specification, if the cutting cylinder is tilted, the resulting inclined groove will have tapered sides that Dickson contends are not parallel to each other. Yet, elsewhere, Dickson acknowledges that claims and specifications often use words of approximation. Dickson Brief at 16. Claim 5 requires "generally" parallel grooves. There is no doubt that the preferred embodiment that Dickson references has grooves in which the length axes are generally parallel to each other, and have forward and rearward side walls (whether tapered or not). This is all that matters for purposes of claim 5; thus, claim 5 does cover this embodiment in the specification.

Although the side walls of these generally parallel grooves have a slight taper, in a macro sense, these side walls too are "generally" parallel. At a minimum, the corresponding forward sidewalls are shown parallel to each other and the rearward sidewalls are parallel to each other.

To avoid further confusion, PET's reference to the side walls was used to describe the parallel nature of the length dimensions of the grooves, not to suggest that claim 5 requires that all the side walls be absolutely parallel to each other. Claim 5 should be construed by the court to require depressions which are longer than they are wide and which are arranged side by side

{WP316157;1}

(and not end to end) so that their lengths are generally parallel to each other and extend lengthwise across the road (not down the road).

## III.    CONCLUSION

The intrinsic evidence is clear, and it clearly supports PET's construction of the disputed claim phrases.  This Court can construe the disputed claim terms based on the intrinsic record alone.  Accordingly, PET submits that the Markman hearing can be confined to the briefs and, if still necessary, oral argument, and it is unnecessary for this Court to receive extrinsic evidence, including the testimony of technical experts, to construe the disputed terms of claim 5 of the '069 patent.

Dated this 27TH DAY of JUNE, 2006.

Respectfully submitted,

Joseph W. Bain
Mark M. Zylka
AKERMAN SENTERFITT
222 Lakeview Avenue, 4th Floor
West Palm Beach, FL 33401-6183
Telephone: (561) 653-5000
Facsimile:  (561) 659-6313


s/Micheal Salem
**MICHEAL SALEM**   OBA #7876
*Salem Law Offices*
111 North Peters, Suite 100
Norman, Oklahoma  73069-7235
(405) 366-1234
(405) 366-8329  TELEFAX

Attorneys for Defendant
PATENT ENFORCEMENT TEAM, LLC

## **CERTIFICATE OF SERVICE**

      **I hereby certify** that I electronically transmitted this document to the Clerk of the United States District Court for the Western District of Oklahoma using the ECF System for filing and transmittal of notice of electronic filing to the following ECF registrants:

    **John A. Kenney, Esq.**
    **Michael D. McClintock, Esq.**

    **David A. Cheek**
    Cheek and Gelnar

this 27TH DAY of JUNE, 2006.

                                        s/Micheal Salem
                                        **MICHEAL SALEM**