**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DICKSON INDUSTRIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> PATENT ENFORCEMENT TEAM, L.L.C., <br><br> Defendant, <br><br> v. <br><br> MIDSTATE TRAFFIC CONTROLS, INC. and SAWHORSE INVESTMENTS, L.L.C., <br><br> Third-Party Defendants. | Case No.  CIV-02-467-HE |

**THIRD-PARTY DEFENDANTS
MIDSTATE TRAFFIC CONTROL, INC.  AND
<u>SAWHORSE INVESTMENTS, L.L.C.'S TRIAL BRIEF</u>**

COME NOW the Third-Party Defendants, Midstate Traffic Control, Inc. and Sawhorse Investments, L.L.C., and hereby submit their Trial Brief.

<u>**Introduction**</u>

This case was filed by Dickson Industries, Inc., (hereinafter "Dickson") as a declaratory judgment action seeking a determination that machines it manufactured and sold to Midstate Traffic Controls, Inc. and Sawhorse Investments, L.L.C. (hereinafter collectively referred to as "Midstate") do not infringe upon claim 5 of a U.S. patent held by Patent Enforcement Team, L.L.C. (hereinafter "PET"). The patent in question is known as "the '069 patent." The machines in question allegedly incorporate the '069 patent method of operation and are capable of cutting

rumble strips. PET joined Midstate and Sawhorse alleging that they infringed upon the patent by using the machine to cut rumble strips in roadways or induced infringement.

In its Order construing the terms of the patent this Court held:

> The primary purpose of the patent is to drain water from the road surface onto the shoulder by cutting grooves on or near the 'edge' of the road. The grooves secondarily serve as rumble strips to alert a driver to the edge of the road. For purposes of both, the patent refers to the edge and surface of the road distinct from the shoulder. In addition, the figures representing the embodiment of the invention indicate that the grooves are cut into the road surface not the shoulder. Accordingly, the court construes the term "road" in claim 5 of the patent to mean that portion of the roadway designed or ordinarily used for travel which does not include the shoulder. *See. This Court's Order filed 10/13/06, as document no. 94. (citations omitted).*

Midstate's Trial Brief is intended to address the means by which the jury should calculate a reasonable royalty if it finds Midstate/Sawhorse owes something to PET for the use of the claimed patent. Thus, with a few exceptions, little attempt is made in this discussion to specifically reference documentary evidence or deposition testimony. The jury will be the ultimate arbiter of any disputed evidence and the final judge of the credibility of the witnesses. Midstate believes the evidence introduced at trial will show the following.

## I. SUMMARY OF PERTINENT FACTS

Midstate's actions with regard to patent '069 were markedly different from the actions taken by the other companies who purchased these machines from Dickson. Sawhorse purchased the machine from Dickson on January 10, 2001. Sawhorse took possession in April of 2001, and shortly thereafter, leased the equipment to Midstate on an exclusive basis. Midstate received a notice from Thomas Grinding Incorporated ("Thomas") on or about May 9, 2001, which advised that Thomas was considering purchasing the '069 patent and that Midstate should

consider reviewing the '069 patent. Midstate forwarded the notice to Dickson the next day. Dickson advised Midstate not to worry and that there was only a "small area of concern" regarding the claim. Midstate continued to bid jobs with the intent to use the machine.

Then, on January 9, 2002, Midstate received its first notice from PET which advised PET now owned the patent and that Midstate should purchase a license for the machine. Midstate immediately contacted Dickson and advised of PET's demands. Midstate sought the advice of legal counsel regarding PET's claim as well as Midstate's claims against Dickson for selling it the machine. On April 3rd, 2002, after a reasonable period of due diligence, Midstate made the decision to stop using its machine and thereby avoid any possible infringement of PET's potential patent claim. From that point in time, Midstate did not bid any jobs which required cutting rumble strips. Midstate did use the machine to complete jobs which Midstate was contractually bound to complete as of January 2002. Midstate's decision to complete those contracts was a mitigation of its damages by protecting itself from breach of contract claims while still respecting PET's potential patent claim. By virtue of Midstate's cessation of use of the machine, PET received the benefit of its patent rights, if in fact it is entitled to such rights.

## II.  THE APPLICABLE LAW

**A. The Method for Calculating a Reasonable Royalty if the Jury Finds Midstate Owes One to PET.**

If the jury finds a patent infringement in this case, it may award PET, "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." *Integra Life Sciences I, Ltd., v. Merck KGaA, 96-CV-1307-B(AJB), 2004 U.S. Dist. LEXIS, 20725, at *12 (S.D. Cal. September 7, 2004)* (quoting *35 U.S.C. § 284* and *Integra Life Sciences I, Ltd., v. Merck KgaA, 331 F.3d 860, 869 (Fed. Cir.*

*2003)*. The Federal Circuit holds that royalties are compensatory damages and are designed to make the, "patentee whole as opposed to punishing the infringer." *Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1312 (Fed. Cir. 2002)*; *see also. Integra Life Sciences I, Ltd., v. Merck KgaA, 331 F.3d 860, 869 (Fed. Cir. 2003)*.

United States Code, title 35, section 284 requires the royalty be reasonable under the particular facts and circumstances of the case. The calculation of a reasonable royalty must take into account a wide variety of considerations. Included within those considerations are PET's past license agreements, the royalties paid by Midstate's competitors and those similarly situated to Midstate. Specifically, special consideration should be given to the licenses and settlement agreements negotiated during the time frame that Midstate is alleged to have begun infringement. *See. Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311, 63 U.S.P.Q.2d (BNA) 1819 (Fed. Cir. 2002); Endress & Hauser, Inc. v. Hawk Measurement Systems PTY. Limited, 892 F. Supp. 1123, 1125 (S.D. Ind. 1995.); and see. Cequent Trailer Products, Inc. v. Intradin (Shanghai) Mach. Co., Ltd., 1:05-CV-2566, 2007 U.S. Dist. LEXIS 9191, at *27 (N.D. OH. February 7, 2007.*

The Federal Circuit requires that "a reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment." *Riles v. Shell Exploration & Prod. Co., 298 F.3d at 1311* (quoting *Hanson v. Alpine Valley Ski Area. Inc., 718 F.2d 1075, 1079 (Fed. Cir. 1983))*. The reasonable royalty calculation must envision and ascertain the result of a hypothetical negotiation between PET and Midstate at a time before the infringing activity began. *Riles at 1311*. "The issue of the amount of the 'reasonable royalty' is to be determined not on the basis of a hindsight evaluation of what actually happened, <u>but on the basis of what the parties to the hypothetical license negotiations</u>

<u>would have considered at the time of the negotiations.</u>" *Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d at 1081* (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d at 1164*) (emphasis added).

The reasonable royalty calculus must assess the relevant market as it would have developed before and absent Midstate's alleged infringing activity. While an exercise in approximation, this analysis must be based on "sound economic and factual predicates." *Riles at 1311*. The very definition of a reasonably royalty assumes, that after payment, the infringer will be left with a reasonable profit. *Georgia-Pacific Corporation v. United States Plywood Corp., 318 F. Supp. 1116, 1122 (S.D.N.Y. 1970), 166 U.S.P.Q.2d (BNA) 235*. Thus, in reaching the determination, it is necessary to consider what the alleged infringer would hypothetically be willing to pay while still making a reasonable profit in its use of the patent. *Id.*

It is fundamentally important that the damages determination is based on "sound economic and factual predicates." *Riles, 298 F.3d at 1311*. Thus, the particular facts of each case must be carefully considered when reaching the determination. The Federal Circuit states that although the damages calculation after a finding of infringement involves "an element of approximation and uncertainty," a reasonable royalty will be held valid as long as the award is supported by substantial evidence, is not grossly excessive, and is not based ***"only on speculation and guesswork."*** *Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371, 1385 (Fed. Cir. 2001) (emphasis added)*. The Federal Circuit says that "When a reasonable royalty is the measure, the amount may again be considered a factual inference from the evidence, ***yet there is room for exercise of a common-sense estimation of what the evidence shows would be a reasonable award."*** See. *Integra Life Sciences I, Ltd., v. Merck KgaA, 2004*

5

U.S. Dist. LEXIS 20725, at *32 (S.D. Cal. 2004) (quoting *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1377 (Fed. Cir. 1999) (emphasis added).

**B.  The Burden of Proof for Willful Infringement.**

Willful infringement is a question of fact that must be proved by clear and convincing evidence. *SRI International, Inc. v. Advanced Technology Laboratories, Inc.*, 127 F.3d 1462, 1465, 44 U.S.P.Q.2d (BNA) 1422 (Fed. Cir. 1997); *E.I. Dupont de Nemours & Co. v. Phillips Co.*, 849 F.2d 1430, 1439-40, 7 U.S.P.Q.2d (BNA) 1129 (Fed. Cir. 1988) ("'the jurisprudence . . . uniformly requires clear and convincing evidence in support of increased damages.'") (citations omitted), *cert. denied*, 488 U.S. 986, 102 L. Ed. 2d 572, 109 S. Ct. 542 (1988). "There are no 'hard and fast *per se* rules,' and the finding [of willful infringement] is based on the totality of circumstances." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1581 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990).

> The question of willful infringement is by definition a question of the infringer's intent. Infringement is not willful if, based on the totality of circumstances, it is determined that [the alleged infringer] acted in good faith and with a reasonable basis for believing that [it was] not infringing the patents-in-suit. On the other hand, infringement is willful if, based upon the totality of circumstances, it is determined that [the alleged infringer] acted in bad faith and without reasonable basis for believing that [it was] not infringing the patents-in - suit. *Gustafson, Inc. v. Intersystems Indus. Products, Inc.*, 897 F.2d 508 (Fed. Cir. 1990).

The totality of the circumstances may include the closeness or complexity of the legal and factual questions presented, and commercial factors that may have affected the alleged infringer's actions. *SRI International, Inc.*, 127 F.3d 1462, at 1465. In *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389 (Fed.Cir. 1983) the Federal Circuit ruled that where a potential infringer has actual notice of another's patent rights, he has an affirmative

duty to exercise due care to determine whether or not he is infringing. That affirmative duty includes the duty to seek and obtain competent legal advice from counsel before the initiation of any possible infringing activity. The absence of such an opinion, however, does not compel a finding of willfulness. *Studiengesellschaft Kohle, G.m.b.H. v. Dart Industries, Inc., 862 F.2d 1564, 1574, 9 U.S.P.Q.2d (BNA) 1273(Fed. Cir. 1988)*. Thus, a potential infringer's affirmative duty is to exercise due care. Whether or not counsel's advice is sought is not by itself determinative of whether the duty has been met. *See. Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1110, 231 U.S.P.Q. (BNA) 185(Fed. Cir. 1986)*. "The test is whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1428, 8 U.S.P.Q. 2d (BNA) 1323 (Fed. Cir. 1988)*.

### III.  APPLICATION OF THE LAW TO THE RELEVANT FACTS

**A.  If a Reasonable Royalty is Owed by Midstate it Should be Calculated in Substantially the Same Manner as that Negotiated by PET and J.C. Cheek Due to the Similarity in Circumstances.**

Midstate believes it does not owe a royalty to PET because PET received the benefit of its potential patent (as the statute requires) by Midstate's cessation of the use of the machine. This was Midstate's stated and valid business purpose as of April 3, 2002. It made this fact known to Dickson and PET. Nevertheless, if the jury finds Midstate owes PET a reasonable royalty, then the royalty should be substantially the same as that which was negotiated and paid by J.C. Cheek Sod and Erosion Contractor, Inc. (hereinafter "J.C. Cheek"). The facts surrounding J.C. Cheek's and Midstate's use of the machine are nearly identical. As explained below, they are certainly more in line with one another than the facts of usage pertaining to any other licensee which PET's expert, Jeffrey Kinrich, has opined upon.

The jury must be given a factual basis to assist it in the determination of a reasonable royalty. Previous license agreements negotiated by the patent holder under circumstances similar to those in the case at bar are frequently used as the cornerstone upon which the determination is made. License agreements which are contemporaneous in time to the date that the hypothetical negotiation would have begun are generally considered to be the most relevant for the purpose of determining a reasonably royalty.

The agreement between PET and J.C. Cheek was executed on December 5, 2001, just one month before Midstate received a letter (dated January 9, 2002) from PET which advised of PET's patent claim. This fact makes the J.C. Cheek agreement the most relevant for the purposes of determining what a reasonable royalty should be for Midstate.

The evidence will show that if a hypothetical negotiation occurred between PET and Midstate, it would have occurred shortly after January 9, 2002, and proceeded along the same lines as the negotiation and agreement between PET and J.C. Cheek. The law establishes the presumption that each party knows all relevant information during the process of their hypothetical negotiation. *St. Clair Intellectual Property Consultants, Inc., v. Canon, Inc.,* 03-241-JJF, 2004 U.S. Dist. LEXIS 19475, at *7 (D.C. Del. September 28, 2004) *(*quoting *Georgia-Pacific Corporation v. United States Plywood Corp.,* 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970))*. Thus, it must be presumed for the purposes of a reasonable royalty determination that Midstate would have been aware of the terms J.C. Cheek received from PET.

A comparison of the terms of PET's license agreement with J.C. Cheek, (marked as Midstate's Exhibit number 51) with the facts of this case, quickly reveals the similarities. Midstate, like J.C. Cheek, made the decision to stop using the machine during the patent's lifetime and to complete only those rumble strip jobs to which it was contractually bound. Thus,

Midstate, like J.C. Cheek, would not have had a need to purchase a license for future use. Nor would it have needed to negotiate a "running" royalty or a royalty "going forward" up to and through the expiration of the patent's life.

The eight other PET licensees discussed in Mr. Kinrich's report are unlike Midstate and J.C. Cheek because they intended to continue using their machines. Accordingly, they needed to buy a license for future use and to negotiate a "running" or "going forward" royalty so they could continue using their machines during the patent's lifetime. The eight other PET license agreements which serve as the basis of Mr. Kinrich's reasonably royalty opinion are not the best evidence of what a reasonable royalty should be as concerns Midstate.

Due to the factual similarities and the closeness in time to the J.C. Cheek license, a logical conclusion for the jury to reach would be Midstate's hypothetical negotiation with PET would result in the consummation of an agreement which contained the following terms: (1) No Machine fee; (2) a limited "going forward" license *that terminated* when the presently contracted rumble strip cutting projects were completed with an associated per foot royalty (as opposed to the expiration of the patent); and (3) a "phase out" or "back" royalty which served to account for rumble strips cut before Midstate knew of PET's patent claim.

Mr. Kinrich attempts to distinguish the J.C. Cheek agreement from the case at bar. He says it is not relevant to the discussion because, "it is a settlement license that does not contain provisions for future use of the patent aside from satisfying those contracts that have already been accepted." Mr. Kinrich wants the Court and jury to ignore the one PET license agreement with facts that are nearly identical to Midstate's actual usage of the machine! As demonstrated by the facts and the authorities cited above, Mr. Kinrich's opinion on this matter is not well grounded in law or in fact. In reality, the J.C. Cheek agreement *is relevant and admissible*

9

pursuant to the authorities cited herein, and under the facts of this case. Among the past PET license agreements, it should be given the most consideration when calculating any royalty owed by Midstate.

Midstate's president will testify that, like J.C. Cheek, he would not have purchased a license for future use for economic reasons. Like J.C. Cheek, Midstate did not intend to use the machine during the remaining life of the patent. If any reasonable royalty is owed by Midstate, it should be determined based upon the fundamental principal embodied in the J.C. Cheek agreement – which was that the parties had need of settling for past jobs and allowing completion of remaining jobs only. This principal is in accord with *Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d at 1081* (the hypothetical reasonable royalty negotiation must be based on what the parties to the hypothetical license negotiations would have considered at the time of the negotiations.).

It is an inescapable fact that, unlike all other PET licensees mentioned in Mr. Kinrich's report, Midstate and J.C. Cheek stopped using their machines during the patent's remaining life after receiving notice of PET's claim. This common factor is dispositive of the issue as to how Midstate's royalty should be calculated. It requires there be an equivalent commonality in the royalty negotiated and paid by J.C. Cheek and any hypothetical reasonable royalty calculated for Midstate. Due to the specific nature of reasonable royalty calculations, and due to the likeness in circumstances, common sense and fairness require that if Midstate is to pay a reasonable royalty, it should be calculated in substantially the same way as the J.C. Cheek royalty.

**B.   There was No Intentional or Willful Use of the '069 Patent by Midstate.**

When Midstate received notice from PET on January 9, 2002, it immediately began to exercise due diligence. It sought the advice of legal counsel. It then consulted with Dickson.

After gathering all the information it could, Midstate made the decision to essentially park its rumble strip machine and to not use it during the remaining life of the '069 patent. Midstate's actions show that it followed the letter of the law with regard to how one must respond to a patent infringement claim. The evidence will be clear and convincing that Midstate was not a willful infringer of the '069 patent. The authorities cited above require the Court take into account an alleged infringer's actions after receiving notice of potential patent infringement claim. The evidence will show Midstate had no knowledge a patent claim existed until it received PET's notice. In fact, Midstate believed its purchase of the machine came with the implied warranty the machine did not infringe on any patent claims and an express indemnity against infringement claims.

The Court has ruled that the patent does not cover rumble strips that were cut on the shoulder of the road. The evidence will show that all of the rumble strips cut be Midstate were cut on the shoulder of the road, with one minor exception. There was a one-time, experimental venture in which a total of 160 feet of rumble strips were cut in the roadway at the request of the State of Oklahoma. Those rumble strips did not utilize a continuous "or simultaneous" process as required by the Court's order of October 13, 2006. They were not cut on the edge of the road with a design to diverting water off the roadway as the patent (and this Court's order) clearly provides. Nor were they intended to alert drivers their car may be leaving the roadway. Instead, they were cut in the travel lanes with the intent of warning a car that there was a hazard in front of it, and not that it was leaving the roadway. The use and the purpose of the 160 feet of rumble strips are completely different from those designed in the patent. For these reasons there can be no finding of intentional infringement by Midstate.

It is clear from Midstate's April 3, 2002, letter that its stated business purpose was to avoid wherever possible any potential infringement upon PET's patent claim. Midstate obviously did not intend to purposefully infringe on PET's '069 patent claim. Because the issue of willful infringement is by definition a question of the alleged infringer's intent, there is no basis for finding Midstate is subject to an award of increased damages or attorney fees.

### C.  The Doctrine of Equivalents.

Midstate/Sawhorse adopt the legal authorities and arguments made by Dickson in its Motion for Summary Judgment pending before this Court.

### CONCLUSION

The cases provide that a determination of a reasonable royalty must be based upon an application of accepted legal standards to the specific facts and circumstances of each case. Midstate believes the jury will find there was no infringement and that Midstate does not owe PET any royalty. The jury will most likely agree that Midstate made every attempt to provide PET with the benefit of its asserted patent claim, if valid. It did so by not using its machine except to complete contracts accepted prior to receiving notice of PET's claim. If the jury finds otherwise, then PET's license agreement with J.C. Cheek should be given close scrutiny and should serve as the basis of any reasonable royalty calculation.

Respectfully submitted,

　s/ DAVID A. CHEEK
　　DAVID A. CHEEK, OBA #1638
　　CHEEK & FALCONE, P.L.L.C.
　　6301 Waterford Boulevard, Suite 320
　　Oklahoma City, Oklahoma  73118-1157
　　Telephone:　405/286-9191
　　Facsimile:　405/286-9670
　　E-mail:　　dcheek@cheekfalcone.com
Attorney for Third-Party Defendants, Midstate Traffic Control, Inc. and
　Sawhorse Investments, L.L.C.

## CERTIFICATE OF SERVICE

☑　I hereby certify that on the 29th day of June, 2007, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

John A. Kenney – john.kenney@mcafeetaft.com
Michael D. McClintock – michael.mcclintock@mcafeetaft.com
Anthony L. Rahhal – Anthony.rahhal@mcafeetaft.com
Joseph W. Bain – joseph.bain@akerman.com
Micheal C. Salem – msalem@msalemlaw.com


　s/ DAVID A. CHEEK

S:\10119.003\PLEA(6380).doc